We are recording. Hear ye, hear ye, this Honorable Appellate Court for the Second Judicial District is now in session. The Honorable Robert D. McLaren presiding. Your Honors, the first case on the docket this morning is 2-21-0053, in re the estate of Mark A. Coffman, deceased, Peggy LeMaster and Kathleen Martinez, appellants, the Dorothy Coffman and Courtney Coffman Crenshaw appellees. Arguing for the appellants, Mr. David E. Lieberman. Arguing for the appellee, Mr. Matthew R. Barrett. Mr. Lieberman, you may proceed. Thank you, Justice McLaren. Good morning, and may it please the Court. This is an appeal from a will contest. This Court and our Supreme Court have fashioned and enforced a set of legal rules for well more than a century to protect testamentary freedom and to protect vulnerable testators and their intended beneficiaries. Camera seems to have gone out. Can you see me? No, but we can hear you. May I have just a minute to check that? May I take a minute, Your Honor, to have a look at my camera? Fine. Go ahead. Mr. Lieberman, see that top video? Do you have that covered up? Oh, I hit that. Thank you. Sorry. Two years of doing this, I've not had that problem. This Court and our Supreme Court have fashioned and enforced legal rules designed to protect testamentary freedom and vulnerable testators and their intended beneficiaries from undue influence exerted on the testator in the making of his or her will. Mr. Lieberman, very quickly, you covered yourself up again. Hit that stop video button. There you are. Are you asking us to look at this de novo? Review this de novo? Yes, Your Honor. Yes, there's legal error in the application of the settled tests and two errors in applying one test and a failure to apply a second test. We also do maintain that as to one factor of one of the tests, the trial court's finding was against the manifest way to the evidence. What finding was that? That finding, Justice McClaren, was that the Mr. Kaufman, the testator's spouse, Dorothy Kaufman, that she did not participate in procuring preparation or execution of the will. We have an extensive statement of facts, none of which was controverted in Napoli's brief that recites Mrs. Kaufman's participation in procuring the will and obtaining the preparation of the will and its execution. She was involved in the fact she was a co-client of the drafting lawyer by his own testimony. What do you base that on, that he's a co- or that she was a co-client? The counsel, Mr. Hines' testimony. He testified and it's cited in our brief. He testified that he viewed them as joint clients. That was uncontroverted. But he hadn't spoken to him in how many years prior to this meeting? You said that Mr. Hines had not spoken to Mr. Kaufman? Right. I mean, he prepared a will previously, the previous will, but had he spoken to him prior to the time where his wife called to set up an appointment? No, that is uncontroverted, undisputed. They hadn't spoken in decades. And if I may clarify, the prior will was not prepared by Mr. Hines, the lawyer who drafted the 2018 will that's the subject of this case. The prior will was drafted by a, at the time in 2001, by a partner of Mr. Hines, who has since retired. That's Mr. Rooks. And he did testify. Same firm, though. I'm sorry? Same firm. Yes, correct. So the errors that we're asking this court to review are in the application of these settled tests, which our contention is that the denial of the misapplication of these tests denied Mr. So the tests are not really in dispute. The first one is in this court's Swenson case and in Supreme Court cases for more than a century, most recently the DeHart case. And that is the test that requires courts to presume undue influence under certain circumstances that contain indicia that undue influence was exerted. And that is a test that applies where a person in a fiduciary relationship with the testator procures or participates in procuring preparation or execution of a will under which he or she substantially benefits. Was Dorothy in a fiduciary relationship? Absolutely. And you base that on? On the power of attorney that Mark Kaufman, her husband, executed, naming her agent under that power of attorney. Does she have to exercise that authority? No. Why not? Well, this is not a case concerning a misuse or abuse of the power of attorney. This is just a predicate to whether the court must apply the presumption. And the Shelton case is the most recent Illinois Supreme Court case that we're aware of on this one. It's cited in our brief. Just give me a moment. I'll tell you exactly what it says. This is 2017 Supreme Court case. An individual holding a power of attorney is a fiduciary as a matter of law. The fiduciary relationship between principal and agent begins at the time the power of attorney document is signed. That law has been settled for decades, if not a century, in Illinois. This court below misapplied that law and held just the opposite. Contrary to all law on the subject, it held that just being an agent under a power of attorney does not give rise to a fiduciary relationship. That is clear error. And that's one of the basis of Justice Shostak, why we're asking for de novo review. Pure legal error on that issue. Did the power of attorney give her power to amend any of the property or amend the will without his authority? From recollection, I would have to review the document, but I'm pretty certain that it did not give power to amend the will. But it gave plenary power over dispositions of this property. There were no restrictions on what she could do with his property. And as a matter of fact, in the record in the case, she signed business agreements on Mr. Kaufman's behalf. Just shortly after the time this will was executed. The other just why the fiduciary relationship exists as a matter of law, not only has it been recognized by the Illinois Supreme Court repeatedly in the appellate court. But if one reviews the power of attorney act, it's very clear that the powers given under there are fiduciary in nature. Would it be different if she only had a health care power of attorney? Yes. And that's that's the case on which the court relied and on which the appellee relies. There was one recent case, the Stalin case that involved that. And in that case, the appellate court expressly distinguished health care powers of attorney from the long line of consistent case law concerning property powers of attorney. And of course, it's a much different power. The property power is the power to do anything the agent wishes with respect to any property interest of the principal. It's a vast sweeping power. And its relevance in these cases is that it evidences as a matter of law, just like an attorney client relationship or other relationships recognizes fiduciary as a matter of law. It it is evidence of a trust trusting relationship between principal and agent. And again, this case is not a case concerning misuse of a power of attorney. This just establishes the predicate for determining whether a presumption of undue influence applies. And does the power of attorney give us some indication of the the powers or the the trust in the fiduciary position this particular spouse was in? Absolutely. And this is we discuss this in more detail in our reply brief. And I would ask the court to refer back to that if it has questions on that. But the the power and when we quote the statute and we cite provisions in the actual power of attorney itself, which tracks the statute, the power was sweeping. It was complete control over Mr. Kaufman's property interests. It's it's a vast power. And even the statute itself warns principals, making them that the relationship they say pick somebody you trust because the relationship is fiduciary. And because you are entrusting this person with this vast, unfettered power. So that that fact that that power of attorney was so broad and it was broad, does that work against you, though? Not in any respect that I can identify. No, I think it's a reason the presumption was mandated here. And it's an error that the trial court made, unfortunately, in applying these subtle tests because it held that the presumption of undue influence didn't apply based on its conclusion that we say is erroneous, a legal conclusion that the power of attorney did not give rise to a fiduciary relationship. Also, if this is de novo review and we determined that the presumption was or presumptions were applicable, would we also therefore review the record and determine whether or not the evidence in the record established that the presumption had been overcome? No, that would be up to the trial court and argue is whether the presumption is overcome. And we and if I may, it's one presumption we say you get there by either of two tests, subtle tests, but it's one presumption. The presumption is that the person who participated in procuring the will exerted undue influence over the testator and that the will did not reflect his free will. And to overcome it, if I may, and we cite law in here, there's two cases from this district, the Trampano and I forget the name of the other case, but they're cited in our brief that talk about how much weight is to be given to the testimony of a interested person testifying about her interactions or discussions with a decedent. And we also cite law that says what the burden is on the proponent of the will to overcome the presumption once it's applied. And that is a very high burden. The proponent must overcome it by clear and convincing evidence so that we would submit as an issue to be sent back to the trial court. We would ask the court to direct the court to apply the presumption based on the uncontroverted facts here, and to put the proponent of the will and this is Kaufman to her burden to overcome that presumption by clear and convincing evidence. If the evidence is uncontroverted, the evidence from the attorneys in their testimony indicated that in their opinion, it was Mark that was the one who was telling them what he wanted it was not Dorothy. And so, if, if you have lawyers who've been representing Mark for apparently at least 20 or more years. And if the trial court has the right and ability to weigh the evidence and determine the credibility of the witnesses. Could it not therefore determined that regardless of whether Dorothy was in the room. The lawyers testimony rebutted the presumption that she had any input to what was finally prepared, because he supposedly discussed Mark discuss the issues of the will and what he wanted in it with his lawyers and actually redacted a portion of the will. The opinion of the lawyer is not relevant. The only thing that's relevant for the trial court are the facts. Mr. Hines was not an opinion witness, the notion, and part of the uncontroversial uncontroverted evidence justice McLaren is that Mr. bias witness. And that testimony, who is a self bias interest lawyer. Yeah, well the lawyer, yes. Yeah. What is, what would his benefit be to testifying as he did. That's a question that I have, um, you know, is it, is it in his best interest to testify this way or does he have any bias. Why would he testify that he felt he was lucid, that there was no influence why would he testify like that if it weren't, if it weren't truthful. Because of professional reputation professional standing and potential claims against him for legal malpractice. Thank you. Council your time is up. Do you have any further questions. No, I have no additional questions. Thank you, Mary. No, I do not. Thank you. I just want to check on my understanding or at least your understanding of what procedurally happened in the trial court below, there was a trial where testimony was presented. And the trial court made rulings. And we review the judgment, not the findings, and if we determine that the presumptions apply, but that the finding of the trial court in denying your petition was not against the manifest way to the evidence. Then we affirm the judgment on the basis that despite the presumptions they were in fact rebutted. And you can test what I've just said, I do in two respects, Your Honor. One, there is an element of this appeal that contends that the trial courts finding as the one factor was against the manifest way to the evidence. That is the factor that Mrs Kaufman did not participate in procuring preparation or execution of the will. We submit that there is if words have meaning. Then, most certainly, she participated in procuring preparation of the will, based on uncontroverted testimony, her own, and Mr Hines, and second, that if the court direct finds that there was error in failing to apply the presumption. Then there's a question that hasn't been considered, and the standard is not at that point the standard is the proponent of the will must overcome the presumption by clear and convincing evidence. So that would be the standard that applies to the evidence. Is there clear and convincing evidence, despite the presumption that this will reflected Mark Kaufman's free will, and was not the product of undue influence. And, and she procured the will by making a phone call on behalf of her husband, indicating that he wished to change his will, or is there other evidence besides that. There's other evidence, and it's detailed in our statement of facts and it's detailed in our reply brief on that particular point but the evidence if I can summarize it is that she made the phone call. She told Mr Hines, what changes. Mark wanted in his will. Mark was just emerging from three days of delirium. He was in extraordinary pain. He was being administered opioids for those pain for that pain. He was almost completely debilitated. Mrs Kaufman told again told the lawyer, what changes Mark wanted. She arranged for him, the lawyer to come from Morris, Illinois to Chicago an hour trip on a Saturday, the next day to March hospital room and present two versions of a new will for Mark. She stayed present in those meetings throughout Mr Hines never had a moment alone with Mark Kaufman. She was by all accounts by and certainly by Mr Hines account the lawyer, an active participant in those negotiations over what the will would look like Mr Hines said they were both his clients in the preparation and execution of the will. The factor that was important to Mrs Kaufman, I think you've answered the question. Thank you. Okay, Mr Barrett, you may proceed. Thank you. Good morning, Your Honors, my name may please the court. My name is Matthew Barrett and I represent Dorothy Kaufman, the widow of the late Mark Kaufman petitioners are asking this court to throw out Mark Kaufman's last will and testament, after having presented no evidence of actual undue influence of trial. Rather, they're asking this court to presume that a spouse of 24 years who by all accounts was loving a loving and caring wife to Mark overcame and destroyed her husband's free will. And that presumptive when she when the lawyer she called the lawyer correct. That's right, and Mark's direction, and she was in the room the entire time that this that he spoke to the lawyer. That's, that's right. And prior to this, she, she did not have interest in the business. No, and neither did Mark sisters and and and she she was, you know, married to the proprietor of the business for 24 years. You know, there was testimony that markler worked long hours, you know, her life was part of this business, almost just as much as his was as his wife throughout this period of time. But this is a family business for how many years. Decades. Exactly. Right, right. So, you know, he had nephews that work there that also testified they worked very long hours. And so, as, as the will goes now no family is going to be involved in this business anymore, except the wife. No, that's not actually correct. First of all, the nephews never testified at trials, that's not part of the record. And secondly, Mark's cousin Mike Kaufman is still a part owner of the business. Mark was the, the largest shareholder after he inherited his father share so his father, who, who started the business with his brother Mark's uncle determined to leave all of his shares to Mark. Right. Okay. So, so the sisters were never part of that business in the same way that Mark was right. So more was the one. Correct. Correct. She was never an owner of the business, either. And, and if I can get back to the presumption that we're talking about you know that what we're asking the court to presume I think it's important to recognize that the presumption that the petitions are asking for is a presumption that his will was destroyed, and it was overcome, either through coercion. Lies through you know there's there's no way to define how it happens, but the standard is that we're presuming that it was destroyed and overcome, and that presumption itself rests solely on the existence of a 16 year old power of attorney, and the fact that she assisted Mark, when he decided to make changes to his estate plan. Well, isn't the fact that that his men, his mental condition was back and forth during this period of time. I mean, it. One would have to think when you're starting to change your will as substantially as he changed his will when you are in the middle of morphine and then you're in the middle of being, you know, not responsive for days then you come back, then you go back into somewhat of a stupor. I mean, one would presume that this is probably not a good time to change your will, isn't it. No, I disagree with that and here's why. First of all, that is a disputed fact and the court found that you know the doctor who testified about the morphing he was on first of all he wasn't there that day. There's no dispute that, you know, there was a period of delirium after Mark was administered anesthetics for procedure that he undergone he'd undergone earlier in the week, and was scheduled to undergo another procedure later after the will was executed. So there was this this window of time where there's no dispute that there was no, you know, medical records of delirium on the 16th and 17th, which is really the operative timeframe for our analysis, the analysis is what took place at the time, the will was signed. There's also evidence in the record that Mark, you know, knew the lawyers were coming he had told his nurse, that day, he had made a comment to another doctor that the lawyers were coming to make changes to as well. There, there's never been a dispute is not a capacity case, Mark's capacity is not an issue here. And I'm sorry, just just shots like you're muted I didn't catch that it's not his capacity is not an issue. It's not they're not contesting the will on the basis that he lacked capacity. I think petitioners position is that his mental status impacts the presumption, but there is a dispute. There is a dispute as to you know what that that mental status was at the time, and the judge found not credible. The doctor that you know they've cited extensively in their brief as support for that position. But I'd like to back up for a second, your honors and just talk about the history of Illinois cases and how they treat this four factor presumption test in the context of a long term marriage. There's, there's basically three main cases there's clog of sack which is an appellate court case, which looked at these four factors and said wait a minute. Why is it easier for a spouse to trigger all four of these factors and it is for someone outside the marriage. For example, we expect spouses to repose trust and confidence in one another to take care of one another when they're ill. And those are the same factors that the court under this four factor test looks at to determine whether undue influence should be presumed. So the closer spouses are to one another, the more likely it is that they're going to trigger this four factor presumption and clog of sex said, Well, that doesn't seem right that doesn't seem to make sense, we should apply this presumption, if at all, in the marital context with caution and the heart the Supreme Court case that came after blog of SEC agreed. They said yeah that that doesn't make sense we should we should apply this cautiously if at all, we agree we find blog of SEC instructive. And the facts of the heart indicate why the heart, the Supreme Court case into heart decided to leave open the possibility of a presumption, because in that case, much unlike this case, there was a testator was 83 years old. He met his second wife at a Sam's Club where she worked, they were married in a matter of months. The will that he signed that left his estate, his entire estate to his second wife at the expense of his son, who got who received nothing under the new will was executed after they've been married for less than a year, and she provided the lawyer she found the lawyer to do this work. She had a power of attorney, and it appears to use it the allegations where she was involved in his business dealings. That those facts are a far cry from what we're dealing with here, the case the case here is much more alike to blog of SEC in which there was a 34 year marriage. Yes, the wife took care of her husband when he was ill. Yes, she drove him places. But the court found you know that's not enough. That's not enough to presume undue influence. And the final case that kind of fits in between those two is the great house case, and that case you're dealing with a husband who was 30 years younger than his wife, who made a change to her estate plan to leave him everything. He had a power of attorney was using it was at the house when the will was signed and in and out of the room. Even on that on those facts, your honors, the court said we're not going to presume undue influence between husband and wife there. And it's through that lens that we have to view this case, you know petitioners are essentially asking the courts will apply this four factor presumption test, as if it's a cousin or a stranger or somebody else was in the room and made the phone call and respectfully, that's a completely different scenario, and the courts record isn't isn't it though the same scenario when you have an albeit they were married for 20 some years, you have a second wife, you have a child. I'll be at an adult child you have siblings who've been in a business, who have been related to a business their father grandfather or great grandfather started it, and then you have this woman coming in and basically stripping everyone of this family business for years How is this any different than, then the scenarios that you set out. Yeah, it's different from the heart in a number of ways so you know first of all, one of the huge factors there is the son into heart was put out completely mark has a daughter from a previous relationship her bequest is unchanged she got $100,000. Correct. They weren't close that that request was made in 2001, and it's the same in 2018 Dorothy does not increase her share at the expense of the daughter and that's part of this disproportionate benefit as compared to someone else in the same class, which is part of the first factor of the presumption test the heart case, you know petitioners are arguing that will know Supreme Court cases ever use those, those words or use that phrase right. But the heart case actually did apply that that component of the first prong in finding that you know the wife there cut out the sun. She benefited to the detriment of someone with an equal share to the wife. That's not present here so that first factor can't be satisfied, even if there was a fiduciary relationship, just based on this power of attorney, and to further answer your question your honor the sisters had no expectation that this business was coming to them. Mark could have sold the business. But the previous will had given them much more than the subsequent will correct. It gave them. Yes, it did. It reserved a remainder of state, and anything that wasn't used during Dorothy's lifetime to the sisters, and that control was shifted to Dorothy under the 2018 will, but the point is, they were never aware of that will they were never told that hey, I'm leaving you this business. So, so their expectations that you know they were going to participate in this if they truly had those expectations came after the fact. And that's really one of the most important distinguishing factors of this case there's a number of what I'll call red flags that courts, look at when determining whether the circumstances are suspicious enough to warrant this presumption. You know one is like, which lawyer did the wife call. Right. And in this case, the wife called the lawyers that Mark and his family have been using for decades. His parents use this law firm, Mark use this law firm his cousin use you know his aunts. They were intimately familiar with the coffin family and Mark. Mark recognized him when he walked in the room and commented about how, you know, he had, he was hard of hearing despite the fact that they haven't seen each other and, you know, decades. The only reason that the previously drafting lawyer wasn't there was because he was retired. Right, she called that law office, what an opportunity to come in and bring in some other lawyer, right, another red flag that's completely lacking in this case, isn't any element of secrecy. Dorothy told everyone this was happening. The doctors and the nurses knew that the lawyers were coming. She told the petitioners who were at the hospital that week that lawyers were coming, Mark was making changes to his will. They testified they had no concerns at the time that that fact tells you everything you need to know about this case. It wasn't until after they learned about what the changes were that they became concerned about what had happened. There's, you know, comments again that Mark made to his medical professionals, he knew that the lawyers were coming and what, you know, the timing of the change. It does make sense you know what better time to make a change to your state plan. If you haven't updated it in 17 years, and you've just been told, you should think about hospice care. So, but it's not that he didn't know he was ill, he's been ill for quite a while I mean why wait until the eve of hospice to change your will. The trial court found on that point that people drag their feet on things they know they should do. There was a comment in the medical records and Mark said I know I've been dragging my feet on this. You know, the evidence is full or excuse me the record is full of evidence that Mark sisters, his wife, we're giving him hope. Yes, if you look at the medical records and in retrospect, it looks bleak, but at the time when someone's going through those proceed, you know those those health proceedings there there. They're optimistic, he was he was a fighter, he was going to fight this and find a cure. And, and unfortunately it didn't happen and at that moment when you know reality starts to set in what better time to make a change. I'd like to pivot briefly to this this concept that the power of attorney satisfies prongs one, two, and three of the presumption test because that's what petitioners are asking here that that power of attorney, Mr Barrett was extremely broad wasn't it. It was it was a property power of attorney I'm not sure if there were specific restrictions or specific instructions about what could or could not be you could or cannot be used for, but it was never used. It's, it was executed and sat there for 16 years. The hard case there's a power of attorney in a hard case. So, if the power of attorney is the beginning and the end of the analysis that's all we need to look at for set to satisfy steps one, two, and three, the heart court would have stopped at, hey, we have a power of attorney, whether she was exercising control over his business affairs, they alleged she was. So, those second and third steps of this test have to mean something right signing a power of attorney alone says nothing about dependence and dominance. I could sign a power of attorney for my wife today, she could sign one naming me her agent. That doesn't mean we're both simultaneously dependent and dominating each other at all times moving forward. It just doesn't. So, so this test isn't just satisfied by virtue of the power of attorney alone, and the court went through steps two and step three, and said, they don't satisfy any of those. And finally, as to the procurement issue that is a manifest way to the evidence issue. It's I see my time has expired, your honors. May I briefly conclude or answering any. Yes, you may, you may. The point there is the court weighed all the facts and found that this wasn't procured and they weren't limited to just looking at the phone call the court looked at everything. And that finally that that last. The second presumption test that's been overruled and Belfield versus coop. You don't have to take my word for it. Petitioners Council co authored an article saying the exact same thing. So for those reasons, Your Honor. This court should affirm the grants of directed judgment. Thank you. Any other questions. No. Thank you, sir. Mr Lieberman you have five minutes. Thank you. What better time to change your will in the 16 intervening years, if you have a different wish as to how you want to dispose of your property. Certainly, when you get a diagnosis, two and a half years before your death of what is often a terminal illness throat cancer. Certainly, when you have procedure after procedure, and you have chemotherapy and immunotherapy, and all of these things for two years, that's a better time than when you're emerging from three days of delirium. And the comment that Mark told his doctors, a lawyer was coming, and that he was dragging his feet. He also said my wife is mad at me. Okay, so that's another indication of undue influence. We'd asked the court to disregard Mr Barrett statement about the daughter not being close because it's not part of the record and in fact it's not true. But what is part of the record is that Mr Heinz in his meeting is one meeting with Mr Kaufman never once asked him, what do you wish to do for your daughter. And this is a daughter who did not come from the marriage to Mrs Kaufman, came from a relationship before. Never asked Mark what he wanted to do, providing for his daughter. There were questions about Mark's mental status and his emerging from delirium. Again, and that is highly relevant. It's relevant to not again we're not saying he didn't have capacity. Capacity under the probate act is a pretty low standard. But what he was because of his diminished state is vulnerable to undue influence and that is recognized under Illinois law and we cite in the last section of our main brief. And I believe in a reply the law under the second test, which by no means has been reversed and we discussed that at length in our brief. But the second test Illinois law recognizes that and it uses this archaic language that testators who are enfeebled are vulnerable to undue influence. So that is a recognized factor. And that's why Mr Kaufman's physical and mental status as of the 16th when Mrs Kaufman made the phone call and the 17th when Mr. Hines came and the will was executed. That's why it's of critical importance. The sister's expectations are irrelevant. I mean, the fact is that they were not focused on their testimony as such. They are not focused at the time their brother is dying on what he's going to leave them, and they are trusting of family, but that has nothing to do with whether undue influence occurred here. It doesn't have anything to do with Mr. Barrett said they didn't even know what they were given in the old will. Is that relevant? I'm trying to recall what was deposition testimony and what was trial testimony here before I answer that and be careful. I actually don't know that there's any record at trial about that. Yeah, I guess my question Mr Lieberman is if they were left nothing. And then this new will came out, and they are left nothing. Would we be here today. Well, I would be a question standing, but the fact is they, there was a generous request to them under the 2001 will, and under the changed will. Everything was dependent on what Mrs. Kaufman wanted to do. Mr. Kaufman reserved that power to himself under will one, and specifically carved out these family business interests, the business founded by their father, and earmarked that for his sisters. And again, the first will generously provided for Mrs. Kaufman. She had a lifetime interest in that and all kinds of other assets. So it's not a question of whether she was not well provided for. On the question, let me ask you this Mr Lieberman after today's after today's hearing, what is it that you would want us to do. Thank you. Reverse the finding that there is no fiduciary relationship. And the related finding that there was not dominance independence and we cover that in detail in our reply brief at pages 11 to 13. Reverse the finding that Mrs. Kaufman did not procure preparation and execution of the will or did not participate, and it asked the court to look at its own decision and Swenson on that issue. Ask that we ask the court to direct the trial court to apply the presumption to say that the presumption applies here as a matter of law, based on the uncontroverted facts. And direct the trial court on remand to put the will proponent to her burden to overcome the presumption by clear and convincing evidence, and to give the court last word to give the court guidance to follow the tramp and oh and the other case we cite on that about how much weight should be accorded to the testimony of self interested witnesses about their dealings with a deceased person. So reverse the directive finding basically, and send it back. Correct. That brings up any other questions. No, sir. The question that is somewhat hard to propound is you say that the facts are uncontroverted. And I think reasonable persons could read those facts, mull them over and come to different conclusions as to whether or not Dorothy was the, the, the person behind the curtain at referencing the Wizard of Oz. And I'm having problems with the statement that you're making that these are uncontroverted. Are you saying that what's uncontroverted is the ultimate issue of fact, or are you claiming that all the facts and evidence are in your favor. I appreciate the question Justice McLaren because I think I caused confusion in the way I articulated that based on the question. We are not saying that everything in the record is uncontroverted. We are saying that every fact recited in our statement of facts in this appellate brief. Every single fact is uncontroverted in the response. And those facts that you that subset of the overall facts mandate application of the presumption of undue influence. As to the ultimate finding, whether the will did or did not result from undue influence or whether that presumption can be overcome. That's a question that in our view has to be ultimately determined in the trial court. We don't think it can be determined on this record because that proponent was never put to that test. I will also just add that it is not our case is not about coercion or the other word Mr. But it's an undue influence case, and there doesn't have to be untoward conduct on the part of the of Mrs Kaufman or the person who's allegedly unduly influenced. The question is just whether there was influence at a level that prevailed over the free will of the testator. So we're not here for the court to find wrongdoing. What we're trying to ask the court to determine is did this will this 2018 will. Is it the product of Mark Kaufman's free will or is it the product of undue influence exerted on him? In so far as the first will is concerned. What happens if Dorothy spends all the money in the trust. What happens to the business interest, are they given over to the petitioners, or are they dealt with in some other way. The first will creates a trust for Dorothy's benefit. She's trustee, but it has a special carve out for these Kaufman family business interests. The truck sales operating business and the real estate holding company special carve out. And the trustee originally would be Dorothy. She's named trustee would have the right to invade principle as under a certain standard, except for those business interests. She doesn't have the right to invade principle as to those interests. And that that's what changed here is that that special carve out for those interests. It's one of the change. There are others that are material to our clients, but that's the main one. And are those carve outs liquidated upon her death? No. Are they distributed in certain percentages? Well, Mark owned, I believe at the time of his death, two thirds of the shares of the operating company, and one third of the membership interest in the real estate company. Those would go 5050 to his two sisters under the original will. And I think it said in her stir fees if they had no, no will. Memories better than mine, but I think that's right. I have no further questions. Are there any other questions. Okay, thank you. We will take the case under advisement and render disposition in an apt time. Thank you very much for the oral argument. Sorry for the any delay that I may have caused. Mr. Clerk, you may close out the proceedings. Thank you. Thank you. Thank you both.